UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUIS VALDEZ and TELMA VALDEZ,

        Plaintiffs,

                                      CASE NO. 1:12-CV-381

v.

                                      HON. ROBERT J. JONKER

UNITED STATES OF AMERICA,
MICHELLE ROCHA, MATTHEW PUTRA
AARON LUTTON, JASON ANDREWS,
RONALD REYNOLDS, and JON PAUL
DEMARSE,

        Defendants.

_____/

## OPINION

      This is a civil rights and Federal Tort Claims Act ("FTCA") action arising out of a United States Immigration and Customs Enforcement ("ICE") raid in Grand Rapids, Michigan. This matter is before the Court on cross motions for partial summary judgment. The Court heard oral argument on the motions; they are fully briefed and ready for decision. For the reasons set forth below, the Court will grant Defendants' motion in part and deny it in part, and deny Plaintiffs' motion.

### I. Factual Background

      Many facts of the case are decidedly disputed. Defendants themselves offer divergent accounts of some basic facts. The parties nevertheless agree on the following.

      *Team "Charlie"*

      The Office of Enforcement and Removal Operations is charged with implementing ICE's Fugitive Operations Program, which seeks to locate and apprehend "alien fugitives," defined as persons with outstanding orders of removal from the United States. (Lutton Dep., Ex. 1, Docket

#125, Page ID 1038, 1040.)  ICE operates the program through Fugitive Operations Teams.  The individual defendants were part of Detroit-based Team "Charlie."  (Demarse Dep., Ex. 4, Docket #125, Page ID 1163.)

Prior to conducting field enforcement actions, ICE officers compile a list of potential alien fugitive targets (*Id.* at 1040; *see also* Fugitive Operations Overview, Ex. 37, Docket #170, Page ID 4787–89.)  Officers gather leads for these targets from multiple sources, including local police departments and other federal agencies, such as Citizenship and Immigration Services and Customs and Border Protection.  (*Id.* at 1039–40.)  Officers then prepare a Field Operations Worksheet ("FOW") for each target.  (Putra Dep., Ex. 2, Docket #215, Page ID 1086.)  To prepare the FOW, officers research a potential target's immigration history using databases operated by federal agencies.  (Lutton Dep., at 1041.)  Officers may also obtain information from private databases, such as Accurint, which contains credit information, vehicle information, property ownership, and names of relatives and other known associates.  (*Id.*)  Additionally, officers have access to Canadian immigration information, such as Canadian driver's license information, criminal history, and warrants.  (*Id.* at 1049.)

Once completed, a FOW is placed in a target folder.  Target folders may contain signed removal warrants (Form I-205), immigration history, recent photographs, and information about the target's associates.  (*See id.* at 1056–57; Fugitive Operations Handbook, Ex. 38, Docket #170, Page ID 4805.)  Officers are trained to run reports on non-target associates that they may encounter in the field, including citizens and legal permanent residents.  (Lutton Dep., at 1056–57.)

Absent exigent circumstances, an operational briefing precedes every enforcement action. (Fugitive Operations Handbook, Ex. 38, Docket #170, Page ID 4809.)  The briefing covers

"information in the target folder, including the type of warrant being executed (administrative arrest, criminal search, or criminal arrest)." (*Id.*) At briefings, officers pass around photographs, share target folders, and discuss descriptive information about the targets. (*See, e.g.*, Rocha Dep., Ex. 5, Docket #125, Page ID 1193.) The purpose of the briefing is to "know who you're looking for and be able to identify them." (Putra Dep., at 1106.)

In February 2011, Team Charlie prepared to travel to Grand Rapids, Michigan. Prior to departure, immigration officers prepared FOWs and target folders for target alien fugitives. Agent Ronald Reynolds learned that Jose Calvo Cortave (sometimes referenced as "Principal Target"), an alien fugitive, had recently been arrested for driving with a suspended license. (Reynolds Dep., Ex. 3, Docket #125, Page ID 1131; Police Report, Ex. 8, Docket #126, Page ID 1270.) Agent Reynolds identified other alien fugitives associated with Principal Target Cortave's address, 43 Rose Street. (Reynolds Dep., at 1132.)

*Irma Calvo Sanchez (sometimes referenced as "Associated Target Sanchez")*

Principal Target Cortave's Accurint report listed Irma Calvo Sanchez as a possible associate. (*Id.*) An immigration judge had issued a warrant for Associated Target Sanchez's removal on December 11, 2001. (*Id.*; Warrant of Removal, Ex. 10, Docket # 126, Page ID 1280.) Associated Target Sanchez had registered her vehicle at 43 Rose Street in July 2008. (Reynolds Dep., at 1132.) Her driver's license had since expired. (*Id.*) An immigration officer other than the defendants in this case drove by 43 Rose Street on September 22, 2010 but did not locate Associated Target Sanchez or her vehicle, and there were "no leads." (Reynolds Dep., at 1133.) Using the information he compiled, Agent Reynolds created an FOW for Associated Target Sanchez. (*Id.*; *see also* FOW,

Ex. 10, Docket #126, Page ID 1278.) The FOW indicates that Associated Target Sanchez was 56 years old, 5 feet, 2 inches tall, 140 pounds, with brown eyes, black hair, and a medium complexion.

### Norma Rodas Santos (sometimes referenced as "Associated Target Santos")

Agent Reynolds's investigation also linked Norma Rodas Santos to 43 Rose Street. (Reynolds Dep., at 1136.) Agent Reynolds prepared a FOW indicating that Associated Target Santos was 46 years old, 5 feet, 3 inches tall, 145 pounds, with brown eyes, black hair, and a medium complexion. (FOW, Ex. 11, Docket #126, Page ID 1285.) She was an immigration target associated with the Principal Target, Mr. Cortave.

### Telma Valdez (Plaintiff Telma Valdez)

Agent Reynolds also identified three associates of Associated Target Sanchez: Plaintiff Telma Valdez, Plaintiff Luis Valdez (Plaintiff Telma Valdez's son), and Oscar Ovidio Valdez Lopez (Plaintiff Telma Valdez's husband). (Reynolds Dep., at 1136.) On February 17, 2011, Agent Reynolds compiled information on Plaintiff Telma Valdez. He ran various reports containing her address (140 Griggs Street), vehicle information, driver's license information, and immigration status. (*Id.* at 1136–37.) There were no warrants for Plaintiff Telma Valdez's arrest. (*See* Ex. 31, Docket #163.)

Agent Reynolds printed information about Plaintiff Telma Valdez and wrote "LPR" (for legal permanent resident) on it. (*Id.*; Ex. 31, Docket #163, Page ID 3989.) Agent Reynolds testified during his deposition that he wrote "LPR" so he and his team would know that Plaintiff Telma Valdez was a legal permanent resident—not an alien fugitive—should they encounter her in the field. (*See id.* at 1136, 1153.) Under the letters "LPR," Agent Reynolds also wrote a description of Plaintiff Telma Valdez's vehicle—a 1996 chevy—and her license plate number. (*Id.* at 1137; Telma

Valdez File, Ex. 31, Docket #163, Page ID 3989.)  He also printed a full-page photo of Plaintiff Telma Valdez and included it in the file.  (Reynolds Dep., at 1137.)  Because Plaintiff Telma Valdez was not a target, he did not create a separate FOW.  (*See id.* at 1136–37.)  Plaintiff Telma Valdez was 43 years old, 5 feet, 2 inches, 130 pounds, with brown eyes, black hair, and a medium complexion.  (*See* Telma Valdez Driver's License, Ex. 49, Docket #142, Page ID 2718; Telma Valdez Dep., Ex. 2, Docket #133, at 1536.)

### *43 Rose Street*

Team Charlie arrived in Grand Rapids in the afternoon of February 23, 2011.  (Demarse Dep., at 1168.)  Its targets included Principal Target Cortave, and Associated Targets Sanchez and Santos.

First, the officers discussed their targets over the radio.  (Reynolds Dep., at 1139.)  Agent Reynolds testified that it is customary to pass photographs of targets around to all the officers before a raid.  (*Id.*)  Agent Reynolds could not recall, however, if he shared photographs of the targets at 43 Rose Street with the other officers.  (*Id.*)  Officer Lutton testified at his deposition that he had seen a photograph of Principal Target Cortave.  (*See* Lutton Dep., at 1062.)

The officers exited their vehicles and approached the house.  Either Agent Reynolds or Officer Lutton carried the target folders to the front door.  (*Id.* at 1062; Reynolds Dep., at 1138–39.)  The remaining four officers—Rocha, Andrews, Putra, and Demarse—secured the area around the house.  (*See, e.g.*, Rocha Dep., at 1195.)  Officer Lutton knocked on the front door, observed Principal Target Cortave inside through a front window, and recognized him as a target from his photograph.  (Lutton Dep., at 1062.)  Officer Lutton saw Principal Target Cortave look at him through the window, pick up his telephone, and make a call.  (*Id.*)  The parties agree that he spoke

to Plaintiff Telma Valdez.  He told her that the police were at his house but there is no indication that he knew or told Plaintiff Telma Valdez that the officers were immigration officials.  (*See* Telma Valdez Dep., at 1513–14.)  Shortly thereafter, Principal Target Cortave came to the door.  (*Id.*) Officer Lutton and Agent Reynolds identified themselves as "police," not ICE agents.  (*Id.*; Reynolds Dep., at 1142.)  Recognizing Cortave as their "main target," Agent Reynolds yelled "TANGO" over the radio to indicate to the others that he had identified a target.  (Reynolds Dep., at 1142.) According to Officer Lutton, Principal Target Cortave consented to a search of the house.  Shortly thereafter, one of the officers handcuffed Cortave.  (*Id.* at 1143; Rocha Dep., at 1198.)  Officer Rocha—the only officer on the scene who could speak fluent Spanish (Putra Dep., at 1107)—asked Principal Target Cortave in Spanish if there were other people in the house.  (Rocha Dep., at 1198.) He replied that some people resided in an upstairs apartment.  (*Id.*)  The officers searched for other targets.  The parties dispute whether the officers obtained consent to enter or search the upstairs apartment.

The officers encountered the Gomez family in the upstairs apartment.  As they escorted the family downstairs, Officer Andrews heard rustling in one of the upstairs bedrooms.  (Andrews Dep., Ex. 6, Docket #126, Page ID 1241.)  He entered the bedroom and discovered an open window.  (*Id.*) Outside the window, a man—later identified as Alder Perez Calvo ("Fugitive Calvo")—was standing on the roof holding white shoes with black soles.  (Putra Dep., at 1108; Reynolds Dep., at 1143.) Eventually, the officers talked Fugitive Calvo back into the house, handcuffed him, and escorted him downstairs.  Calvo was later identified as an alien fugitive.  In total, the officers escorted six people downstairs—three adults (Principal Target Cortave, Fugitive Calvo, and Remigio Leonardo Gomez)

6

and three children (CGC, age 16; CGC, age 14; and LG, age 5). The adults were handcuffed. (Rocha Dep., at 2257.)

After the officers moved Fugitive Calvo downstairs, a car arrived on the scene unannounced and parked in the garage. (Putra Dep., at 1108.) Officer Putra and Agent Reynolds approached the car. (*Id.* at 129; Reynolds Dep., at 1144.) The parties dispute whether the officers asked for identification or whether they immediately ordered the man—later identified as Herminio Cruz—out of the car and handcuffed him.

Shortly after Mr. Cruz's arrival, Plaintiffs arrived unannounced in Plaintiff Telma Valdez's white chevy with the license plate number that Agent Reynolds had recorded in the target folder. (*See* Reynolds Dep., at 1145; Putra Dep., at 1109.) Agent Reynolds and Agent Demarse approached Plaintiff Telma Valdez's car. (Putra Dep., at 1109–10.) Office Putra stayed with Mr. Cruz's car in the nearby garage. (*Id.*)

The parties offer sharply contrasting accounts of the following events. On cross motions for summary judgment, the events must be viewed from the light most favorable to the non-moving party. Accordingly, the Court presents each side's version of events separately.

## A. Defendants' Account

Just moments after Mr. Cruz's car unexpectedly arrived on the scene, Plaintiffs arrived. Their vehicle made an abnormally loud noise, as if the driver had been speeding and then "slammed" on the brakes. (Reynolds Dep., at 1144.) Agent Reynolds approached the driver's side of the vehicle. (*See id.*; Luis Valdez Dep., Ex. 1, Docket #131, Page ID 1422, 1425.) Upon arrival, Plaintiff Luis Valdez exited the vehicle and Agent Reynolds's first words to him were to "calm down." (Reynolds Dep., at 1145.) Plaintiff Luis Valdez's behavior prevented Agent Reynolds from asking for, or

obtaining, his identification. (*Id.* at 1145–46.) According to Agent Reynolds, the officers "had to get the situation under control before [they] could get identification." (*Id.* at 1145.) Agent Demarse approached Plaintiff Telma Valdez's passenger side window and asked her in English for her identification and whether she lived there. (Demarse Dep., at 1174.) Plaintiff Telma Valdez responded in English by asking who the officer was and why he was there. (*Id.*) By that point, Agent Demarse observed that Agent Reynolds already "had [Plaintiff Luis Valdez] . . . outside the car," so Agent Demarse asked Plaintiff Telma Valdez to exit the vehicle as well. (*Id.*) She complied. (*Id.*) Fewer than 30 seconds after Plaintiff Telma Valdez exited the vehicle, Agent Reynolds shouted "TANGO" from the other side of the vehicle to indicate that he believed Plaintiff Telma Valdez was one of the targets. (*Id.* at 1175.) Agent Demarse again asked Plaintiff Telma Valdez for identification but she again responded with questions. (*Id.*) Agent Demarse explained that they were the "police" and they were "conducting an investigation." (*Id.*) After hearing the word "TANGO," Officer Putra, who was walking nearby with a subject in custody (presumably Mr. Cruz), asked Agent Reynolds if he was sure that Plaintiff Telma Valdez was a target. (*Id.*) Agent Reynolds responded "yes," and Officer Putra ordered Agent Demarse to "hook her up," meaning to handcuff Plaintiff Telma Valdez. (*Id.*) When he yelled "TANGO," Agent Reynolds thought that Plaintiff Telma Valdez was one of the two Associated Targets (Sanchez or Santos), or Plaintiff Telma Valdez; he could not be sure which without further investigation. In other words, Agent Reynolds believed he had a reasonable basis to detain Plaintiff Telma Valdez to determine whether she was one of the Associated Targets, and not an LPR. (Reynolds Dep., at 1146.)

Agent Demarse walked Plaintiff Telma Valdez to the rear of her vehicle. (*Id.* at 1176.) She became physically noncompliant. (*Id.*) When Agent Demarse attempted to handcuff her, she "tried

to spin away from [him] by pushing off the trunk" toward Agent Reynolds and Plaintiff Luis Valdez. (*Id.* at 1177.) According to Agent Demarse, Plaintiff Telma Valdez made statements to him in English, such as "You can't do this, you can't do this. Who are you? You don't have a warrant." (*Id.* at 1178.) Shortly thereafter, he handcuffed Plaintiff Telma Valdez. (*See id.*)

Around the same time, Agent Reynolds asked Plaintiff Luis Valdez to walk toward the front of the driveway. (Luis Valdez Dep., at 1428.) He complied, with Agent Reynolds following behind him, but when Plaintiff Luis Valdez heard his mother yell, he stopped about 15 to 20 feet away from the car. (*Id.* at 1428–29.) Plaintiff Luis Valdez turned, pivoted and took one or two steps toward his mother. (*Id.* at 1431; Reynolds Dep., at 1147.) Plaintiff Luis Valdez appeared agitated. (Putra Dep., at 1111.) His eyes "got wide," which Agent Reynolds interpreted as "pre-indicative of an assault." (Reynolds Dep., at 1150.) Agent Reynolds handcuffed him out of concern for officer safety. (Luis Valdez Dep., at 1431; Reynolds Dep., at 1147.) Officer Putra told Plaintiff Luis Valdez that he was "not under arrest," and that he was in handcuffs for his own safety and for the safety of the officers. (Putra Dep., at 1112.) The officers then escorted Plaintiffs into the residence. (Luis Valdez Dep., at 1438, 1443.)

According to Officer Rocha, Plaintiff Telma Valdez was "ranting and raving" as she entered the house. (Rocha Dep., at 1208.) Agent Demarse asked the people inside if Plaintiff Telma Valdez was "Irma" [Associate Target Sanchez]. (Telma Valdez Dep., at 1537–38; Luis Valdez Dep., at 1446–47.) Everyone responded "no" or shook their heads. (Luis Valdez Dep., at 1446–47.) Mr. Leonardo Gomez told Officer Rocha that Associate Target Sanchez had moved to Canada. (Remigio Leonardo Gomez Dep., Ex. 9, Docket #135, Page ID 2342.)

Plaintiff Luis Valdez explained to the officers that his mother was a legal permanent resident and she had her green card. (Luis Valdez Dep., at 1447.)  At some point, Plaintiff Telma Valdez signaled that her green card was in her pocket. (*See id.* at 1449; Telma Valdez Dep., at 1539.) Because Plaintiff Telma Valdez was handcuffed, an officer reached for her pocket. (Luis Valdez Dep., at 1449; Telma Valdez Dep., at 1539.)  The officer was male, and Plaintiff Telma Valdez said "no," but indicated that Officer Rocha—the female agent—could retrieve it. (Luis Valdez Dep., at 1449; Telma Valdez Dep., at 1539.)  Officer Rocha retrieved Plaintiff Telma Valdez's green card from a wallet and showed it to the other officers. (Telma Valdez Dep., at 1540–42.)

The officers then asked Plaintiff Luis Valdez for his green card. (Luis Valdez Dep., at 1450.) He stated that he was a United States citizen. (*Id.* at 1450–51.)  After Plaintiff Luis Valdez answered a few questions, the officers said Plaintiffs were free to go. (*Id.* at 1451–53.)  The officers removed their handcuffs and escorted them to the door.

### B. Plaintiffs' Account

Plaintiffs tell a different story.  It was daylight and the scene at 43 Rose Street was relatively calm. (*See* Luis Valdez Dep., at 1422.)  The adults inside had already been handcuffed and the premises were secured. (*See* Putra Dep., at 1116; Rocha Dep., at 1201.)  Everyone in the house was compliant. (Rocha Dep., at 1201; Lutton Dep., at 1063.)  Plaintiff Luis Valdez was driving. (Telma Valdez Dep., at 1518.)  Plaintiff Telma Valdez was in the passenger's seat and the family's new puppy was in back strapped into a harness. (*Id.* at 1518, 1521.)  Plaintiffs had previously planned to visit their relatives sometime that day to show them the puppy. (*Id.* at 1513.)  When Plaintiff Telma Valdez heard from Principal Target Cortave by telephone that the police were at his house,

she decided to visit.  (*See* Telma Valdez Dep., at 1514.)  Plaintiff Luis Valdez did not know the police were at the house.  (*Id.*)

Plaintiff Luis Valdez was driving under 25 miles per hour.  (Luis Valdez Dep., at 1422.)  The antilock brakes were broken, so the car squeaked or screeched a little, but not loud enough to be heard inside the house. (*See id.* at 1424; Carol Gomez Calvo Dep., Ex. 13, Docket #127, Page ID 1302; Remigio Leonardo Gomez Dep., at 2343.)  As Plaintiffs pulled into the driveway, Agent Reynolds ran toward them with his firearm drawn.  (*See* Luis Valdez Dep., at 1423; Telma Valdez Dep., at 1516.)  Agent Reynolds's clothing had the word "police" on it but there were no visible markings identifying him as an immigration officer.  (*See, e.g.*, Telma Valdez Dep., at 1517.)  Agent Reynolds approached Plaintiff Luis Valdez's side of the car and asked him to roll down the window. (Luis Valdez Dep., at 1425.)  He complied.  (*Id.*)  Agent Reynolds reholstered his firearm.  (*Id.*)  Agent Reynolds asked for identification and Plaintiff Luis Valdez gave him both his and his mother's driver's licenses.  (*Id.* at 1426.)  Agent Reynolds opened the driver's side door and ordered Plaintiff Luis Valdez to exit.  (*Id.* at 1427.)  Driver's licenses in hand, Agent Reynolds asked Plaintiff Luis Valdez, "who is Luis Alejandro Valdez?"  (*Id.*)  Plaintiff Luis Valdez replied that he was.  (*Id.*)  Agent Reynolds repeated the question two more times.  (*Id.*)  Agent Reynolds refused to believe Plaintiff Luis Valdez but did not attempt to verify his identity by asking additional questions.  (*See id.*)  Agent Reynolds ordered Plaintiff Luis Valdez to walk toward the front of the house and he complied.  (*Id.*)  He did not handcuff Plaintiff Luis Valdez.

Plaintiff Telma Valdez was still in the passenger's seat when she heard the word "TANGO." (Telma Valdez Dep., at 1522.)  Agent Demarse ran toward Plaintiff Telma Valdez's side of the car and opened her door.  (*Id.* at 1525.)  He signaled for her to exit and she complied.  (*Id.*)  Plaintiff

Telma Valdez did not ask why Agent Demarse was there or whether he had a warrant. (*Id.* at 1525–26.) Agent Demarse handcuffed her at the side of the car and then walked her to the rear of the car. (*Id.*) Agent Demarse began talking in English and Plaintiff Telma Valdez did not understand. (*Id.* at 1527.) Agent Demarse kicked her leg, indicating that she should separate her legs. (*Id.*) The kick left a bruise. (*See* Photo of Injury, Ex. 47, Docket #141, Page ID 2698, 2701.) Plaintiff Telma Valdez was leaning over the trunk of the car. (*Id.*) Agent Demarse repeatedly asked if she was "Irma [Associated Target Sanchez]," and hit her head against the trunk of the car three times. (*Id.* at 1527, 1532.) It was painful, and Plaintiff Telma Valdez began crying. (*Id.* at 1532.) She cried out, "please no, please no." (*Id.*) Plaintiff Telma Valdez felt Agent Demarse press his firearm into her back. (*Id.*) She had recently undergone surgery on her right side and was worried that Agent Demarse was going to cause the wound to tear open. (*Id.* at 1533.) Shortly thereafter, Agent Demarse took Plaintiff Telma Valdez inside the house. (*Id.*)

Initially, Plaintiff Luis Valdez was not handcuffed. However, as Agent Reynolds walked him toward the house, Plaintiff Luis Valdez heard his mother cry out. (Luis Valdez Dep., at 1428.) He was about 15 to 20 feet away from her and Agent Demarse. (*Id.*) He turned toward them. (*Id.* at 1430.) As he shifted his weight, he nearly lost his balance, so he pivoted and stepped to avoid falling. (*See id.*) At that point, Agent Reynolds handcuffed him. (*Id.* at 1431.) Agent Reynolds told Plaintiff Luis Valdez to "stay calm," and Officer Putra approached on Plaintiff Luis Valdez's right. (*Id.* at 1432.) Plaintiff Luis Valdez asked, "What are you going to do? Call ICE on us?" (*Id.*) Officer Putra stated, "We are ICE; you're under arrest." (*Id.*)

The officers took Plaintiffs into the house. Inside, Plaintiff Telma Valdez tried to tell the officers in English or Spanish that she was a legal permanent resident, but the officers "didn't try to

see if that was true." (Telma Valdez Dep., at 1539.)  According to one third-party witness, the agents

ignored Plaintiff Luis Valdez's claims of citizenship:

> A.    [Plaintiff Luis Valdez] was saying that he was a U.S. citizen.  And then they told—he told the officers where he was born.  And then he said that he was born in Texas.  And then they—they were just—I think they didn't believe him, because they were just ignoring him.
>
> &ast; &ast; &ast;
>
> A.    When he was telling them, they were just ignoring him.  But they were just kind of pretending they weren't listening.
> Q.    Were they talking amongst each other?
> A.    No, they were just, like—they were just ignoring my cousin . . . .
> Q.    Were they laughing?
> A.    They were just smiling, just like, you know, making fun of what he was saying.

(Crisma Gomez Dep., Ex. 12, Docket #136, Page ID 2500, 2512.)

One officer threatened Plaintiff Telma Valdez with the loss of her residency papers.  Plaintiff

Luis Valdez testified:

> I said, "My mother has her papers with her."  My mother, in her jumbled English, attempted to do the same.  One of the agents said, "It doesn't matter.  She can lose them at any time we want."

(Luis Valdez Dep., at 1447.)  Third-party witnesses testified to hearing this threat.  (*See, e.g.*,

Remigio Leonardo Gomez Dep., at 2352; Crisma Gomez Dep., at 2498.)  Plaintiffs say several

agents also made comments about their presumed illegal status.  Officer Rocha, for example,

responded to Plaintiff Luis Valdez's statement that he had rights in this country by stating, "Shut up.

You have no rights here."  (Luis Valdez Dep., at 1445.)

Eventually, after Plaintiff Telma Valdez indicated that her green card was in her pants pocket,

an officer attempted to retrieve it.  (Telma Valdez Dep., at 1540.)  Plaintiff Telma Valdez said "no,"

because the officer was male, but  indicated that Officer Rocha (a female) could remove it.  (*Id.* at

13

1541.)  Using the green card, the officers confirmed that Plaintiff Telma Valdez was a legal permanent resident.

According to Plaintiff Luis Valdez, one of the agents demanded that he turn over his residency papers. (Luis Valdez Decl., Ex. 64, Docket #153, Page ID 3236.)  He responded, "I don't have any.  I'm a U.S. citizen." (*Id.*)  The agents "looked happy" when Plaintiff Luis Valdez said that he did not have papers, but "their attitude changed" when he said he was a citizen. (*Id.*)  The officers asked Plaintiff Luis Valdez questions to confirm his citizenship, and, shortly thereafter, one of the agents ordered that Plaintiffs be released.

An officer unlocked Plaintiff Luis Valdez's handcuffs.  Officer Rocha removed Plaintiff Telma Valdez's handcuffs. (*Id.*)  However, instead of unclasping the handcuffs, Officer Rocha pulled the handcuffs over Plaintiff Telma Valdez's knuckles, causing her to cry out in pain. (*Id.*)  She stated, "Ow, esto es un abuso," or, in English, "Ow, this is an abuse." (Luis Valdez Dep., at 1455.)  Feeling mistreated, Plaintiff Telma Valdez informed Officer Rocha that Plaintiffs were going to look for legal help. (*See* Telma Valdez Dep., at 1549.)  Although Officer Rocha did not respond, another agent said, "Don't worry.  They don't have money for a lawyer." (*Id.*)  Several third-party witnesses heard this statement. (*See, e.g.*, Cruz Dep., Ex. 10, Docket #135, Page ID 2400.)  Plaintiff Luis Valdez asked the officers for his driver's license, but an officer responded "no questions." (*Id.*)

Agents escorted Plaintiffs out the front door, pushing them out onto the stairs. (*Id.*)  Plaintiff Luis Valdez caught his balance, but Plaintiff Telma Valdez did not. (*Id.*)  Officer Rocha[1] pushed

---

[1]Plaintiff Telma Valdez testified that it was Officer Rocha who pushed her. (Telma Valdez Dep., at 1550.)  Plaintiff Luis Valdez testified that he believed it was Officer Rocha. (Luis Valdez Dep., at 1457.)  Mr. Leonardo Gomez testified that he saw Officer Rocha and Agent Reynolds grab and push Plaintiff Telma Valdez outside. (Remigio Leonardo Gomez Dep., at 2359.)  Agent Reynolds testified that he believed it was Officer Putra. (Reynolds OPR Aff., Ex. 28, Docket #139,

Plaintiff Telma Valdez out the door and she fell abdomen-first onto the handrail.  (Telma Valdez

Dep., at 1550–51.)  The fall left a visible bruise.  (*See* Photo of Injury, Ex. 47, Docket #141, Page

ID 2699, 2702–03.)  Plaintiff Luis Valdez again asked the officers for his driver's license.  (Luis

Valdez Decl., Ex. 64, Docket #153, Page ID 3235.)  An agent stuffed the license into someone else's

wallet and threw it at him.  (*Id.*)  Plaintiffs got in their car and left.  (*Id.*)  In total, Plaintiffs were at

the house 20 to 30 minutes.  (*Id.*)

Plaintiff Luis Valdez called 9-1-1, and the operator instructed him to file a police report at

the local police station.  (Luis Valdez Dep., at 1465.)  Plaintiffs went to the police department with

Plaintiff Telma Valdez's husband.  (*Id.* at 3236.)  The police department gave them a card with a

telephone number to file an ICE complaint.  (*Id.*; *see also* Grand Rapids Police Card, Ex. 7, Docket

#30, Page ID 379.)  Plaintiff Telma Valdez was "having some sort of shock reaction" and "trembling

violently and could not stop crying."  (Telma Valdez Decl., at 3242.)  A police officer asked if he

should call an ambulance.  (*Id.*)  The family drove Plaintiff Telma Valdez to the emergency room.

(*Id.*)  Plaintiffs documented Plaintiff Telma Valdez's physical injuries, including dark bruises on her

leg and lower abdomen, and raw, grated skin on her knuckles.  (*See* Photos of Injuries, Ex. 47,

Docket #141, Page ID 2698–2703.)

Later that day, while Fugitive Calvo was waiting in a police department processing area, he

could hear the officers talking.  (Alder Perez Calvo Dep., Ex. 15, Docket #136, Page ID 2536.)

Three male agents were standing three to four feet away.  (*Id.*)  One of the officers asked another if

he thought there would be a lawsuit.  (*Id.* at 2537.)  The second officer responded that he did not

---

Page ID 2643 ("One of the Officers, I believe it was Officer Putra, placed his hand on her back and
guided her to the door.").)

think so because "people don't sue us" because they are afraid of the possible immigration consequences.  (*Id.*)  The three agents then discussed what they should say happened.  (*Id.*)  They decided to say that Plaintiff Telma Valdez was resisting and that is why they handcuffed her.  (*Id.*)  They talked about this for about five minutes. (*Id.*)  When they realized that Fugitive Calvo was listening, the officers moved to a different location.  (*Id.*)  Based on what Fugitive Calvo overheard, he suspected that the agents planned to cover up what really happened.  (*Id.*)

After the incident, Plaintiffs sought psychological counseling.  Plaintiff Telma Valdez was treated until her insurance coverage was exhausted.  (Telma Valdez Dep., at 1575; List Decl., Ex. 54, Docket #142, Page ID 2731.)  Her therapist referred her to a doctor who prescribed psychotropic medication, including Zoloft and Xanax.  (Tavera Decl., Ex. 58, Docket #143, Page ID 2778.)  The same therapist evaluated Plaintiff Luis Valdez, but did not treat him because he did not have insurance.  (*See* List Decl., at 2739.)  Defendants' independent medical examiner, Dr. Elizabeth Mellema, concluded that Plaintiff Telma Valdez suffered from post-traumatic stress disorder (PTSD) as a result of the ICE raid.  (Mellema Report, Ex. 55, Docket #142, Page ID 2749.)  Dr. Mellema concluded that Plaintiff Luis Valdez suffered from PTSD and Major Depressive Disorder Single Episode.  (*Id.* at 2752.)

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).  Material facts are facts that are necessary to apply

the substantive law. *Id.* at 248. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

Plaintiffs' claims are: (1) Fourth Amendment unlawful arrest, (2) Fourth Amendment excessive force, (3) Fifth Amendment equal protection, (4) and Federal Tort Claims Act claims for false arrest or false imprisonment, assault and battery, and intentional infliction of emotional distress. Defendants seek summary judgment on all claims except Plaintiff Telma Valdez's Fourth Amendment excessive force claim against Agent Demarse and her FTCA claims for assault and battery and intentional infliction of emotional distress. Plaintiffs seek summary judgment on their Fourth Amendment unlawful arrest claims against Agent Reynolds and FTCA claims for false arrest or false imprisonment, as well as Plaintiff Luis Valdez's FTCA claim for assault and battery. The parties agree that Plaintiff Telma Valdez's Fourth Amendment excessive force claim against Agent Demarse and her FTCA claims for assault and battery and intentional infliction of emotional distress survive summary judgment.

## A. Defendants' Motion

### 1.    Fourth Amendment Unlawful Arrest

Plaintiff Telma Valdez alleges that Agent Reynolds is liable for unlawful arrest for incorrectly identifying her as a fugitive alien target—which led to her arrest—and Agent Demarse

17

is liable for effecting her arrest. Likewise, Plaintiff Luis Valdez alleges that Agent Reynolds is liable for his unlawful arrest. Defendants seek qualified immunity.

Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Tolan v. Cotton*, 572 U.S. __, 134 S. Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope*, 536 U.S. at 739). "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Id.* (internal quotation marks omitted) (alterations in original). Courts have discretion to decide the order in which to address the two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). At summary judgment, courts must draw inferences in favor of the nonmovant, even when a court decides only the clearly-established prong of the standard. *Tolan*, 134 S. Ct. at 1866.

For qualified immunity purposes, "clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official

18

action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted). The Supreme Court has explained that the term "clearly established" "depends largely 'upon the level of generality at which the relevant 'legal rule' is to be identified.'" *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999) (quoting *Anderson*, 483 U.S. at 639). The Court has instructed courts to define the federal right at issue in the specific context of the case, and to take care not to define a case's context in a manner that imports a genuinely disputed factual proposition. *Tolan*, 134 S. Ct. at 1866.

For a constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515 (6th Cir. 1997). "[T]he particular conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right." *Id.* "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Id.* (quoting *Lassiter v. Ala. A & M Univ., Bd. of Trs.*, 28 F.3d 1146, 1150 (11th Cir. 1994)) (emphasis in original).

When a plaintiff alleges unlawful arrest, the federal right at issue is the Fourth Amendment right to be free from unlawful arrest. *See, e.g.*, *Everson v. Leis*, 556 F.3d 484, 500 (6th Cir. 2009). The Court begins with the second prong of the qualified immunity analysis: whether the right at issue was clearly established. The Court thus considers whether Defendants' conduct "fall[s] clearly

within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right." *Saylor*, 118 F.3d at 515.

Viewing the facts in the light most favorable to Plaintiffs, the Court cannot say that a reasonable officer, under the circumstances of this case, would have known that detaining Plaintiffs in the manner alleged violated their Fourth Amendment right to be free from unlawful arrest. Accordingly, the officers are entitled to qualified immunity on these claims.

     A.     *Plaintiff Telma Valdez's Initial Detention*

The Court first considers whether a reasonable officer would have known that detaining Plaintiff Telma Valdez was unlawful. Law enforcement officers may briefly detain suspects without violating the Fourth Amendment upon "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In assessing the validity of a detention, courts consider the totality of the circumstances. *Id.* at 7–8. "A person's apparent illegal status in this country may be equivalent to 'criminal activity' and can support a finding of reasonable suspicion." *United States v. Garcia*, 942 F.2d 873, 877 (5th Cir. 1991); *see also United States v. Cortez*, 449 U.S. 411, 418–22 (1981) ("[T]he question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity."). An investigative detention conducted by an immigration officer with reasonable suspicion of illegal status is permissible under *Terry*. *See, e.g.*, *Garcia*, 942 F.2d at 877; *Cortez*, 449 U.S. at 421–22. "Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994). "Factors such as evasive or erratic behavior, previous

experience with illegal aliens in the area, and manner of dress or speech indicating foreign citizenship may create reasonable suspicion." *Ramirez v. Webb*, 719 F. Supp. 610, 616 (W.D. Mich. 1989) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975)).  "Hispanic appearance, standing alone, is not sufficient to create a reasonable suspicion of illegal alienage." *Id.* (citing *Brignoni-Ponce*, 422 U.S. at 885–87).

In this case, Defendants had reasonable suspicion to believe Plaintiff Telma Valdez was illegally present in the United States.  Agent Reynolds targeted 43 Rose Street after learning that a fugitive alien, Principal Target Cortave, resided there.  Agent Reynolds's research revealed that Principal Target Cortave had other known alien fugitive associates linked to 43 Rose Street, and at least two females with outstanding warrants for removal.  Agent Reynolds had probable cause to arrest those known associates with outstanding warrants.  If Agent Reynolds reasonably believed Plaintiff Telma Valdez was Associated Target Sanchez or Associated Target Santos, he had reasonable suspicion to detain Plaintiff Telma Valdez briefly so he could confirm or dispel his suspicion.  The Court must therefore determine whether Agent Reynolds's mistaken identification was reasonable.

Courts apply an objective reasonableness test to cases of mistaken identity.  *Hill v. California*, 401 U.S. 797 (1971).  "Where the police have probable cause to arrest one party but reasonably mistake a second party for the first, their arrest of the second party is valid." *Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999) (citing *Hill*, 401 U.S. at 801).  In *Hill v. California*, defendant Hill challenged the admissibility of evidence found during a search incident to arrest inside his apartment when officers mistakenly arrested another man staying in Hill's apartment.  401 U.S. at 803.  The parties agreed that the officers had probable cause to arrest Hill.

*Id.* at 802.  The issue was whether, consider the surrounding facts and circumstances, the mistaken identification was objectively reasonable.  *Id.* at 803.  The Court observed, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time."  *Id.* at 804.  The Court held that the mistake was objectively reasonable because the arrestee matched Hill's description (a difference of two inches in height and ten pounds in weight), was in Hill's apartment at the time of arrest, answered Hill's door, and displayed a lack of credibility, such as denying any knowledge of firearms even though a handgun and ammunition clip were in plain view.  *Id.* at 803.  That the arrestee produced identification with the name Miller did not make arrest unreasonable in light of all the facts and circumstances because "false identifications are not uncommon."  *Id.*  The facts of *Hill* have many similarities to the facts of this case, though the legal issue did not involve an arrest warrant directly.

In the context of an arrest warrant, the Court of Appeals for the District of Columbia has summarized the Supreme Court's jurisprudence as follows:

> [W]here the warrant is constitutionally valid . . . the seizure of an individual other than the one against whom the warrant is outstanding is valid if the arresting officer (1) acts in good faith, and (2) has reasonable, articulable grounds to believe that the suspect is the intended arrestee.  Should doubt as to the correct identity of the subject of warrant arise, the arresting officer obviously should make immediate reasonable efforts to confirm or deny the applicability of the warrant to the detained individual. If, after such reasonable efforts, the officer reasonably and in good faith believes that the suspect is the one against whom the warrant is outstanding, a protective frisk pursuant to the arrest of that person is not in contravention of the Fourth Amendment.

*Sanders v. United States*, 339 A.2d 373, 379 (D.C. Cir. 1975).

The Sixth Circuit applied the objectively reasonable test in *Ingram v. City of Columbus*, 185 F.3d 579 (6th Cir. 1999).  In that case, officers chased a man who had tried to sell illegal narcotics

to an undercover officer.  *Id.* at 584.  The suspect ran into a house and hid under a bed.  *Id.* at 584.

The officers pursued him into the house and arrested another man that they found sleeping in the

basement.  *Id.* at 585.  The court denied summary judgment to the defendants, holding that there was

a question of fact whether the officers' mistake was reasonable because the arrestee was "napping

in his basement when apprehended by the police and thus could not have been the same man who

attempted to sell drugs to [an officer] and then outran several officers who were in 'hot pursuit.'"

*Id.* at 596.  Moreover, it noted that deposition testimony supported that the men "d[id] not even

resemble each other."  *Id.*

   This case is not like *Ingram*, for reasons detailed below.  Here, Agent Reynolds acted in good

faith and had reasonable, articulable grounds to believe that Plaintiff Telma Valdez was one of the

Associated Targets when he first detained her.  To the extent that Agent Reynolds had doubts, he

made reasonable and prompt efforts to verify her identity inside 43 Rose Street.  Once he did, he let

her go.  The Court cannot say that a reasonable officer would have known that detaining Plaintiff

Telma Valdez briefly under the circumstances violated her Fourth Amendment rights.  To the

contrary, even accepting Plaintiffs' version of the facts, the Defendants are entitled to qualified

immunity under the *Sanders* test.

     *i.*  *Good Faith*

   First, the facts, taken in the light most favorable to Plaintiffs, leave no genuine dispute that

Reynolds acted in good faith in initially identifying Plaintiff Telma Valdez as a target.  The parties

agree, at a minimum, that Agent Reynolds believed Plaintiff Telma Valdez was one of three women:

Associated Target Sanchez, Associated Target Santos, or Plaintiff Telma Valdez herself.  Only

one—Plaintiff Telma Valdez—had status as a legal permanent resident, and Reynolds had made note

of that in the target folder. The other two were legitimate alien targets, and Agent Reynolds did not

have his target folders in his immediate possession when Plaintiffs unexpectedly arrived. It is

undisputed that Plaintiff Telma Valdez spoke very little English, and the Spanish-speaking officer

on the scene was inside 43 Rose Street. Plaintiff Telma Valdez also had a physical appearance

similar to Associated Target Sanchez, one of the persons subject to a removal warrant. When the

officers brought Plaintiff Telma Valdez inside 43 Rose Street, they asked the other detainees if

Plaintiff Telma Valdez was "Irma [Associated Target Sanchez]." This admitted fact only makes

sense if Agent Reynolds and the other officers subjectively believed that Plaintiff Telma Valdez was

the target. At a minium, the admitted fact demonstrates that the Defendants had enough information

to hold Plaintiff Telma Valdez briefly to confirm or dispel positive identification of the target. When

Defendants learned that Plaintiff Telma Valdez was not Associated Target Sanchez and verified

Plaintiff's legal residency, Defendants released her. The whole process took no more than twenty

or thirty minutes.

ii.     *Reasonable, Articulable Grounds*

Agent Reynolds had reasonable, articulable grounds for identifying Plaintiff Telma Valdez

as a target. *See Sanders*, 339 A.2d at 379. "[S]ufficient probability, not certainty, is the touchstone

of reasonableness." *Hill*, 401 U.S. at 804. There were undeniable similarities between the physical

descriptions of Associated Target Sanchez, Associated Target Santos, and Plaintiff Telma Valdez.

Associated Target Sanchez was 5 feet, 2 inches tall, 140 pounds, with brown eyes, black hair, and

a medium complexion. Associated Target Santos was 5 feet, 3 inches tall, 145 pounds, with brown

eyes, black hair, and a medium complexion. Plaintiff Telma Valdez was 5 feet, 2 inches, 130

pounds, with brown eyes, black hair, and a medium complexion. Plaintiff Telma Valdez was only

three years younger than Associated Target Santos and 13 years younger than Associated Target Sanchez. An officer could have reasonably mistaken Plaintiff Telma Valdez for either of the legitimate targets. That Agent Reynolds questioned the validity of Plaintiff Telma Valdez's driver's license by bringing her inside the house was not unreasonable. In context, Agent Reynolds was in the midst of an ICE raid seeking undocumented immigrants with seven detainees and six officers. He had already detained one, the Principal Target, and alien fugitive associates, including two women with descriptions similar to Plaintiff Telma Valdez. The raid had also uncovered another alien fugitive—Fugitive Calvo—apparently staying in the house and attempting to flee the raid. Under the circumstances, Agent Reynolds was not unreasonable to doubt the validity of a driver's license. *Cf. Hill*, 401 U.S. at 803 ("But aliases and false identifications are not uncommon.") Unsure of Plaintiff Telma Valdez's true identity, but having reasonable suspicion to believe she was one of the associated targets, Agent Reynolds was constitutionally required to take "immediate, reasonable efforts to confirm or deny" her identity. *Sanders*, 339 A.2d at 379. This is exactly what he did. A reasonable officer in Agent Reynolds's position would not have known that detaining Plaintiff Telma Valdez and bringing her into the house to confirm her identity with his file or through the Spanish-speaking agent was a clearly established violation of Plaintiff Telma Valdez's Fourth Amendment right to be free from unlawful arrest.

Plaintiffs argue that this is not a "mistaken identity" case, but a failure to identify case. In essence, they argue that because Agent Reynolds instructed Agent Demarse to handcuff Plaintiff Telma Valdez upon reasonable suspicion that she was one of three people—two target fugitive aliens and one legal permanent resident—he necessarily made an unlawful arrest. But this ignores the totality of the circumstances. Agent Reynolds did not simply round up random Hispanic women on

the theory that one or more of them was probably here illegally.  Rather, he briefly detained a woman who came to the scene of an ICE raid, and who resembled a known associated target of the raid. Even if Plaintiffs are correct in characterizing the Defendants' testimony as harboring some uncertainty about the identification at the time of initial detention, it does not change the qualified immunity calculus.  There is no clearly established constitutional rule that an officer must affirmatively confirm a positive identification of a targeted person before handcuffing her.  To the contrary, the question is whether the tentative identification of a legitimate target was objectively reasonable.  Here, it plainly was, even though further inquiry revealed the tentative initial identification was wrong.

B.    *Plaintiff Luis Valdez's Initial Detention*

Plaintiff Luis Valdez alleges that Agent Reynolds is liable for his unlawful arrest. Specifically, Plaintiff Luis Valdez argues that Agent Reynolds unlawfully arrested him when he handcuffed him outside the house without probable cause or reasonable suspicion.  The Court must determine whether a reasonable officer would have known that handcuffing Plaintiff Luis Valdez in this situation converted his detention to an unlawful arrest.   "[A]n investigative detention does not become unreasonable just because officers handcuff an individual." *Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010).  "Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo." *Id.*  "However, the use of handcuffs is greater than a de minimus intrusion and thus requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.*; *see also United*

26

*States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989) (refusing to hold that placing a suspect in handcuffs without probable cause converts an investigative stop into an unlawful arrest).

On this record, a reasonable officer would not have known that handcuffing Plaintiff Luis Valdez under the circumstances constituted an unlawful arrest. In context, viewing the facts in Plaintiffs' favor, when Plaintiffs arrived, the situation was still fluid. There were only four officers outside with three detainees, and two officers inside with six detainees. One suspect had recently attempted to flee. Thus, when Plaintiff Luis Valdez's eyes widened, and he quickly turned, shifted his weight, and stepped toward his mother and Agent Demarse, handcuffing Plaintiff Luis Valdez for officer safety was an objectively reasonable response. The detention was brief. It did not include removal from the residential premises, or even placement in a patrol car. Within thirty minutes, the officers clarified the situation, concluded that Plaintiff Luis Valdez was presenting no ongoing threat to safety or order and released him with his mother. A reasonable officer would not have had fair warning that handcuffing Plaintiff Luis Valdez under these circumstances would have been an unlawful arrest.[2]

Plaintiff Luis Valdez's detention began when Agent Reynolds stopped the car he was driving. The car brakes squealed or screeched, and Plaintiffs arrived unannounced on the scene of an ongoing

---

[2] Defendants argue that Plaintiff Luis Valdez's detention was permissible under *Michigan v. Summers*, 452 U.S. 692 (1981), and its progeny. Plaintiffs contend that *Summers* is inapplicable. In *Summers*, the Supreme Court established a categorical exception to the Fourth Amendment's probable cause requirement for seizure of a person in the context of executing a search warrant. The Sixth Circuit has not extended *Summers* to arrest warrants, and only a few scattered courts have done so. *See United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003) (extending *Summers* to arrest warrants); *Bartlett v. City of New York*, No. CV031961, 2005 WL 887112, at *8 (E.D.N.Y. Feb. 11, 2005) (same); *see also Solis-Alarcon v. United States*, 432 F. Supp. 2d 236, 251–52 (D.P.R. 2006) (refusing to extend). There is no need to resolve the conflict in this case because the Court finds that the Defendants are entitled to qualified immunity under a straightforward application of *Terry*.

raid of an address connected to several alien fugitives.  Under the circumstances, a reasonable officer would not have known that stopping Plaintiff Luis Valdez's car was a violation of the Fourth Amendment.  Upon reasonable suspicion to make an investigative stop, Agent Reynolds was required to take reasonable action to confirm or dispel his suspicion by identifying Plaintiff Luis Valdez. He did not immediately handcuff Plaintiff Luis Valdez.  Rather, he elected to move him into the house, where there were people who may have been able to identify Plaintiff Luis Valdez.  Moreover, moving Plaintiff Luis Valdez inside limited the risk to officers being outnumbered if more people unexpectedly arrived.  Once Plaintiff Luis Valdez widened his eyes, shifted his weight, and stepped toward his mother, who was being detained, it was a reasonable escalation to handcuff Plaintiff Luis Valdez.  Under the circumstances, a reasonable officer in Agent Reynolds's position would not have known that it was a violation of the Fourth Amendment to move Plaintiff Luis Valdez into the house to verify his identity.

Plaintiff Luis Valdez also argues that because Officer Putra announced that he was "under arrest," Plaintiff Luis Valdez's detention was automatically converted to an unlawful arrest.  Although Officer Putra claims he actually told Plaintiff Luis Valdez he was *not* under arrest, the Court takes Plaintiff Luis Valdez's allegation as true for summary judgment purposes.  A non-arresting officer's characterization of the events is not controlling.  Here, the totality of the circumstances does not create a clearly established arrest such that a reasonable officer in Agent Reynolds's position would necessarily have known that handcuffing Plaintiff Luis Valdez violated the Fourth Amendment.  Accordingly, Agent Reynolds is entitled to qualified immunity.  Nor does Officer Putra's statement—assuming he made it—standing alone form the basis of an unlawful arrest

claim against him.  Officer Putra was not the detaining or handcuffing officer.  To the extent that Plaintiff Luis Valdez alleges a claim against Officer Putra, it does not survive summary judgment.

>    C.    *Prolongment of the Initial Detentions*

Even if their detention was initially valid, Plaintiffs argue that Defendants unreasonably prolonged their detention, converting it to an unlawful arrest.  "An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force."  *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir. 1999).  "When this occurs, the continued detention of suspects must be based upon probable cause."  *Id.*  "Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion."  *Id.* (internal citations omitted).  The use of handcuffs does not "exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution."  *Id.* at 815.  And "[t]here is no rigid time limit for a *Terry* stop.  When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate."  *Id.* (internal citations omitted).  "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing."  *Id.*  "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But '[t]he fact that the protection of the

public might, in the abstract, have been accomplished by "less intrusive" means does not, itself, render the search unreasonable.'" *Id.* at 686–87. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687.

Under the circumstances of this case, reasonable officers would not have known that their actions impermissibly prolonged Plaintiffs' detention, thus converting it into an unlawful arrest. The whole detention lasted no more than twenty to thirty minutes. It all happened on the premises of a residence that Plaintiffs voluntarily came to during an ongoing raid, and after Plaintiffs (or at least one of them) knew police of some kind were at the residence. The raid required six agents to deal with six people in the house, three of whom were undocumented adults, and three additional people outside who arrived during the raid. In less than half an hour, the six agents (only one of whom spoke Spanish) were able to deal with all nine people (many of whom spoke minimal English), arrest the alien fugitives, and release Plaintiffs after confirming their status as LPR or citizen.

Plaintiffs argue that Defendants were not diligent in verifying their identities. They allege, for example, that Agent Reynolds asked Plaintiff Luis Valdez three times "who is Luis Alejandro Valdez?" even after Plaintiff responded that he was Luis Alejandro Valdez. Such questions, however, in the context of the immigration raid, were not unwarranted or unreasonable. Nor did Agent Reynolds's questions impermissibly prolong the detention. They tested his suspicion. Because his suspicion was not confirmed or dispelled, he moved Plaintiffs inside for additional questions. In a short time, the questions were resolved and Plaintiffs were released.

Plaintiffs also argue that Defendants could have used an outside mobile identification unit to confirm Plaintiffs' legal status or asked Plaintiffs to produce additional identification outside

before taking Plaintiffs inside.  The governing test is whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions.  *Sharpe*, 470 U.S. at 686.  A court should take care to consider whether police are acting in a "swiftly developing situation" and "not indulge in unrealistic second-guessing."  *Id.*  Here, the facts, even viewed in Plaintiffs' favor, confirm that the situation was still fluid.  One reasonable method for confirming or denying Defendants' suspicion was to take Plaintiffs inside.  Officer Rocha, the Spanish-speaking officer on the scene, was inside.  Moreover, the detainees inside might reasonably be able to identify Plaintiffs.  And moving all detainees to a common location inside maximized the ability of the officers to manage the situation safely, and minimized the chance of further disruption from unexpected arrivals outside.

Plaintiffs further claim that some officers "ignor[ed]" Plaintiffs' claims of legal residency. (Crisma Gomez Dep., Ex. 12, Docket #136, Page ID 2500, 2512; Telma Valdez Dep., at 1539.)  But the record, viewed in Plaintiffs' favor, does not create a triable issue on prolongment.  Ultimately, within 20 to 30 minutes from the time of arrival, Defendants verified Plaintiff Telma Valdez's legal status by her green card.  This was promptly after Defendants were made aware that she had it and Plaintiff Telma Valdez consented to Officer Rocha removing it from her pocket.  Similarly, Defendants promptly asked Plaintiff Luis Valdez a series of questions to verify his claim of citizenship.  Officers then released both Plaintiffs.  A reasonable officer in Defendants' position would not have known that the brief detention under the circumstances of the case was a violation of a Fourth Amendment right to be free from unlawful arrest.  Defendants are entitled to qualified immunity on Plaintiffs' prolongment claims.

31

2.      **Fourth Amendment Excessive Force**

Plaintiff Telma Valdez alleges that Officer Rocha used excessive force in removing her handcuffs and pushing her out the door.  She further alleges that Agent Demarse used excessive force in handcuffing her and hitting her head against her car.  Plaintiff Luis Valdez alleges that Agent Reynolds used excessive force in brandishing his firearm and handcuffing him.  Defendants agree that Plaintiff Telma Valdez's claim against Agent Demarse survives summary judgment, but seek qualified immunity on the remaining claims.  The Court concludes that Officer Rocha is not entitled to qualified immunity on the rough handcuffing and pushing claims.  Agent Reynolds, however, is entitled to qualified immunity on Plaintiff Luis Valdez's excessive force claim.  Accordingly, the excessive force claims of Plaintiff Telma Valdez against Officer Rocha and Agent Demarse will proceed to trial.

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 134 S. Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).  The proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

> A.   *Plaintiff Telma Valdez*

Plaintiff Telma Valdez alleges that Officer Rocha pulled her handcuffs off over her knuckles without opening the handcuffs, resulting in pain and physical injury. She also alleges that Officer Rocha intentionally pushed her out the door and onto a hand railing, also resulting in pain and physical injury.[3] Officer Rocha seeks qualified immunity.

The Court concludes that Officer Rocha is not entitled to qualified immunity on this claim. Taking the facts in a light most favorable to Plaintiffs, Officer Rocha's conduct violated a clearly established federal right. A reasonable jury could find that Officer Rocha's removal of Plaintiff Telma Valdez's handcuffs—whether considered together or independently from her pushing Plaintiff Telma Valdez down the stairs—violated Plaintiff Telma Valdez's Fourth Amendment right to be free from excessive force. At the time Officer Rocha removed the handcuffs, she knew that Plaintiff Telma Valdez was a legal permanent resident, had committed no apparent crime, and was free to go. Plaintiff Telma Valdez was not a security threat, and had been compliant with the officers' orders. A reasonable jury could find that wrenching locked handcuffs over Plaintiff Telma Valdez's knuckles was unreasonable under the circumstances. A reasonable jury could also find it

---

[3]There is some dispute among Defendants over which agent pushed Plaintiff Telma Valdez. *See supra* note 1. Plaintiffs allege that it was Officer Rocha. At summary judgment, it is not necessary for a plaintiff to identify which defendant among multiple defendants committed a specific act of excessive force. *See, e.g.*, *Pershell v. Cook*, 430 F. App'x 410, 416 (6th Cir. 2011); *Senk v. Vill. of Northfield*, 961 F.2d 1578 (6th Cir. 1992) (per curiam).

unreasonable for Officer Rocha to push Plaintiff Telma Valdez down the stairs and into a rail. Plaintiff Telma Valdez did not pose a threat and was not suspected of committing a crime.  There is no apparent justification for any force, and if a jury believes Plaintiffs' account of what happened, the jury could reasonably find a violation of the Fourth Amendment protection against excessive force.

The Court next considers whether a reasonable officer in Officer Rocha's position would have known that the alleged conduct violated the law.  "[T]he law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 408 (6th Cir. 2009) (internal quotation marks omitted); *see also Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988).  Under the facts as this Court must take them, Officer Rocha's wrenching the handcuffs, and the push down the stairs, represent a paradigm case of "gratuitous force."  So if the jury accepts the Plaintiffs' account, there would be no basis for qualified immunity.

Defendants argue that "even characterizing Officer Rocha's conduct as gratuitous . . . it is not sufficient to rise to the level of an actionable claim under the Fourth Amendment."  (Defs.' Br., Docket #125, Page ID 1024.)  The Court disagrees.  "'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial." *Morrison*, 583 F.3d at 407.  The Sixth Circuit has held that even "a slap may constitute a sufficiently obvious constitutional violation." *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)  It has also found actionable an officer's push of an arrestee's face to the ground after the arrestee was subdued, noting that "[s]uch antagonizing and humiliating conduct is unreasonable under the Fourth Amendment, regardless of the existence of injury, and crosses the line

into physical abuse of an incapacitated suspect." *Morrison*, 583 F.3d at 407 (internal quotation marks and citations omitted).

Defendants cite *McDowell v. Rogers*, 863 F.2d at 1307, and *Schreiber v. Moe*, 596 F.3d 323, 332–33 (6th Cir. 2010), for the proposition that Plaintiff Telma Valdez's injuries are inactionable. Although they offer points of comparison, these cases do not compel Defendants' conclusion. In *McDowell*, the Sixth Circuit reversed a directed verdict in favor of the defendant police officer who hit a compliant, handcuffed suspect with a nightstick, breaking his rib. 863 F.2d at 1304, 1307. The court observed that a "serious or permanent injury" is not required to prevail on a constitutional claim for excessive force. *Id.* at 1307. Finding that "there is nothing trivial about a broken rib caused by a completely unprovoked and unnecessary blow from a policeman's nightstick," the court reversed the directed verdict and remanded. *Id.* In *Schreiber*, an arrestee brought a § 1983 claim for excessive force after an arresting officer repeatedly struck the handcuffed arrestee, resulting in fractured facial bones. 596 F.3d at 332. The court denied the defendant qualified immunity on the excessive force claim but did not address the question of what constitutes an actionable injury. *Id.* at 333. Neither *McDowell* or *Schreiber* provides compelling support for Defendants' position. Plaintiff Telma Valdez's injuries need not be "serious or permanent." That Officer Rocha's alleged blow resulted in a bruised abdomen—rather than a broken rib—is not controlling. A jury could easily find injuries resulting from unprovoked and unnecessary force, and the Court cannot say as a matter of law that such injuries were "trivial." Defendants' argument is therefore unavailing.

### B.   *Plaintiff Luis Valdez*

Plaintiff Luis Valdez alleges that Agent Reynolds is liable for excessive force for brandishing his firearm upon their arrival and handcuffing Plaintiff Luis Valdez during his detention. Because

a reasonable officer would not have known that such actions violated the Fourth Amendment prohibition on the use of excessive force, the Court will grant qualified immunity to Agent Reynolds.

As an initial matter, Plaintiff Luis Valdez's excessive force claim is distinguishable from his mother's claim. Officer Rocha allegedly used gratuitous force as Plaintiffs were being released. By contrast, Agent Reynolds displayed his firearm shortly after the officers had detained seven other people, including one who had attempted to flee. The officers were outnumbered when Plaintiffs unexpectedly arrived with their car brakes squealing or screeching. As Plaintiffs unexpectedly arrived, Agent Reynolds met their car with his firearm brandished, but quickly reholstered it. Brandishing a firearm did not amount to excessive force under the totality of the circumstances—the display of force was brief and only lasted until Plaintiff Luis Valdez stopped the car. Agent Reynolds did not order Plaintiff Luis Valdez out of the car at gunpoint or otherwise use his weapon to coerce or intimidate Plaintiff Luis Valdez. Under these circumstances, even assuming that brandishing the firearm was a constitutional violation, a reasonable officer would not have known so under the circumstances Agent Reynolds faced.

Likewise, Agent Reynolds's use of handcuffs was not excessive force. Nor would a reasonable officer have known the use of handcuffs was a constitutional violation. As discussed above, Agent Reynolds did not initially handcuff Plaintiff Luis Valdez. Handcuffing occurred only once Plaintiff Luis Valdez reasonably appeared to present a physical threat to Agent Demarse. Agent Reynolds is entitled to qualified immunity on this claim.

**3.    Fifth Amendment Equal Protection**

Plaintiffs allege that various officers violated their Fifth Amendment Due Process Clause rights to equal protection of the law by discriminating against them on the basis of race. Plaintiff

Telma Valdez alleges claims against Agent Reynolds, Officer Rocha, and Agent Demarse. Plaintiff Luis Valdez alleges claims against Agent Reynolds and Officer Rocha. Plaintiffs' theory is that, but for their race, their detention, and the treatment they received during their detention, would have been different.[4]  Defendants seek qualified immunity.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, ___ U.S. ___, 133 S. Ct. 2675, 2695 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217–18 (1995)).  Equal protection "provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997).  An officer's discriminatory motivation for undertaking a course of action can give rise to an equal protection claim, even where an officer has sufficient objective indicia of suspicion to justify his actions under the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 813 (1996).  The Constitution "prohibit[s] racial targeting in law enforcement investigations, regardless of whether an encounter was lawful under the Fourth Amendment." *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 542 (6th Cir. 2002).

Law enforcement officers cannot select individuals for investigation or treat individuals differently in the course of an investigation solely on the basis of race or ethnic origin, regardless of whether the treatment is pursuant to a lawful investigation, detention, or arrest.  *See id.* at 533 (denying qualified immunity to police officers who singled out plaintiffs on the basis of "Hispanic

---

[4]Plaintiffs argue in their briefs and represented at oral argument that their claim is not a selective enforcement claim.  Rather, they seek to prove that their detention, and the nature of the resulting investigation, was motivated by race.  (*See* Pl. Resp. Br., Docket #5110–11.)

appearance"). To demonstrate a violation of equal protection, plaintiffs must show "they were subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop." *Farm Labor Org.*, 308 F.3d at 533.

Plaintiffs allege that they were stopped and investigated because of their race. Accordingly, Plaintiffs must show a causal connection between their race and Defendants' treatment of them. "Determining whether official action was motivated by intentional discrimination 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Id.* (quoting *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [discriminatory treatment] bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Courts may draw an inference of discrimination where "acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Viewing the facts in Plaintiffs' favor, Plaintiffs have failed to establish that Defendants discriminated against them on the basis of race. Defendants are entitled to qualified immunity. The direct connection between Plaintiffs' voluntary presence at 43 Rose Street during the ICE raid and the officers' questions and comments about their immigration status distinguishes this case from *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, and similar cases alleging that officials subjected racial minorities to more onerous investigation on the basis of race.

### A.    *Agent Reynolds*

Plaintiffs allege that Agent Reynolds violated the Fifth Amendment by demanding their identification but refusing to accept its validity. The Court considers the first prong of the qualified

38

immunity analysis: whether the facts, taken in a light most favorable to Plaintiffs, shows that the officer's conduct violated a federal right. It does not. The totality of the circumstances leaves no triable issue on whether Agent Reynolds detained and questioned Plaintiffs in violation of the Fifth Amendment. Plaintiffs arrived at the scene of an ongoing ICE raid in which Defendants had apprehended a target alien fugitive with known fugitive associates. The Plaintiffs arrived in a car with brakes screeching or squealing after another person arrived in a separate car. The officers were outnumbered and they had reason to believe that other undocumented immigrants might arrive at the scene. Under the circumstances, Agent Reynolds's decision not to immediately accept the validity of Plaintiff Luis Valdez's driver's license does not support discriminatory motive. Agent Reynolds legitimately suspected persons arriving at 43 Rose Street to be associates of Principal Target Cortave, already arrested at the scene. This was a legitimate, non-discriminatory reason for suspicion, and Plaintiffs have not produced any evidence beyond speculation that Agent Reynolds was motivated by a discriminatory purpose. Additionally, when Agent Reynolds handcuffed Plaintiff Luis Valdez, he was motivated by officer safety. He only resorted to handcuffs after Plaintiff Luis Valdez made a sudden movement toward his mother and Agent Demarse. The circumstances do not support an inference of racial animus.

Second, Plaintiffs allege that Agent Reynolds wrongly identified Plaintiff Telma Valdez as a target alien fugitive because of her race. This argument also fails to establish discriminatory purpose. There is no evidence to support that Agent Reynolds identified her as a target simply because she is Latina. Rather, Plaintiff Telma Valdez shared similar physical features to two targets—Associated Targets Sanchez and Santos. The physical resemblance of these individuals was close enough for a reasonable mistaken identification. Agent Reynolds acted in good faith and

promptly sought to clarify inside 43 Rose Street whether Plaintiff Telma Valdez was in fact one of the targets by asking other detainees in the house. And Agent Reynolds promptly released her after confirming that Plaintiff Telma Valdez was not an immigration target.

Third, Plaintiffs allege that one of the officers, possibly Reynolds, was motivated by race in remarking, "[I]t doesn't matter [that Plaintiff Telma Valdez had legal status papers]. She can lose them at any time we want." (*See* Luis Valdez Dep., at 1447; Remigio Leonardo Gomez Dep., at 1296.) Though an ill-advised and unprofessional taunt, the Court cannot say that the remark evidences racial animus, even assuming it was uttered just as alleged. Rather, the offending officer's comment relates to an officer's belief that a detained, suspected undocumented immigrant would falsely claim legal status. As the Supreme Court has recognized, "aliases and false identifications are not uncommon." *Hill*, 401 U.S. at 803. Without evidence of intent to discriminate on the basis of race, Plaintiffs' Fifth Amendment claim against Agent Reynolds cannot survive. Agent Reynolds is entitled to qualified immunity.

B.     *Officer Rocha*

First, Plaintiffs allege Officer Rocha made two statements suggesting racial animus. They allege that Officer Rocha responded to Plaintiff Luis Valdez's statement that his mother had a green card by stating, "It doesn't matter. She's in our file." (Luis Valdez Dep., Docket #171, Page ID 4889.) Plaintiffs also allege that when Plaintiff Luis Valdez asserted, "I have rights," Officer Rocha responded, "Shut up. You have no rights here." (*Id.*)

A court may consider threats and derogatory, racially-inflected comments in determining whether an officer acts with discriminatory purpose. *See, e.g.*, *Bennett v. City of Eastpointe*, 410 F.3d 810, 831 (6th Cir. 2005) ("[S]ummary judgment was particularly inappropriate because of the

40

alleged racial tones to the officer[s'] conduct."); *King v. City of Eastpointe*, 86 F. App'x 790, 803 (6th Cir. 2003) ("Although the question is close, the evidence of the use of a possibly racial epithet raises an issue of fact as to whether [a defendant's] actions . . . were based on race."); *Carrasca v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002) (observing that a factfinder could determine that an officer's reference to plaintiffs as "Mexicans" was stated as a pejorative racial slur and demonstrated a racially discriminatory purpose).   Nonetheless, the use of racial epithets alone "without harassment or some other conduct that deprives a victim of established rights, does not amount to an equal protection violation." *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999).

In this case, Officer Rocha's alleged comments do not support a Fifth Amendment violation. Although highly unprofessional, the comments relate to Plaintiffs' legal status and are not evidence of racial animus.   In this context, they do not support a Fifth Amendment claim.

Second, Plaintiffs allege that Officer Rocha's treatment of Plaintiff Telma Valdez in removing her handcuffs and pushing her out the door supports racially discriminatory intent.  Officer Rocha did not make any statements to suggest that race-based considerations motivated her treatment of Plaintiff Telma Valdez, either in removing her handcuffs or allegedly pushing her.   Plaintiffs' theory is based on speculation alone.   The totality of the circumstances, even viewed in Plaintiffs' favor, merely suggest that Officer Rocha inappropriately directed her frustration about the situation at Plaintiffs.  Although Officer Rocha's alleged actions support a Fourth Amendment excessive force claim, they do not evidence racial animus.   Officer Rocha is thus entitled to qualified immunity on the Fifth Amendment claims.

C.      *Agent Demarse*

Finally, Plaintiffs contend that Agent Demarse acted with racially discriminatory purpose in handcuffing Plaintiff Telma Valdez and using excessive force by hitting her head against her car. The parties agree that Plaintiff Telma Valdez's Fourth Amendment excessive force claim based on Agent Demarse's alleged conduct survives summary judgment. These allegations do not, however, support a Fifth Amendment claim. First, Agent Demarse relied on Agent Reynolds's identification of Plaintiff Telma Valdez as a target when he handcuffed her. There is no evidence to support that he was motivated by racial animus in handcuffing her. Second, Agent Demarse's only statement to Plaintiff Telma Valdez at issue in this claim is that he asked her if she was "Irma [Associated Target Sanchez]." (Telma Valdez Dep., at 1531.) None of the facts surrounding Agent Demarse's question—even asking it multiple times—suggest that his question was impermissibly motivated by race. Rather, the effect was to confirm or dispel the tentative identification of Plaintiff Telma Valdez as one of the associated targets of the raid. Accordingly, Plaintiffs' allegations against Agent Demarse, taken as true, do not support a Fifth Amendment violation. Agent Demarse is entitled to qualified immunity on this claim.

**4.      Federal Tort Claims Act**

Finally, Plaintiffs allege FTCA claims against the United States for false arrest or false imprisonment, assault and battery, and intentional infliction of emotional distress. The parties agree that Plaintiff Telma Valdez's FTCA claims for assault and battery and intentional infliction of emotional distress survive summary judgment. Defendants seek summary judgment on all other FTCA claims.

The United States has sovereign immunity except to the extent that it consents to be sued. *See, e.g.*, *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  The FTCA operates as a limited waiver of the United States's sovereign immunity.  *See, e.g.*, *F.D.I.C. v. Meyer*, 510 U.S. 471, 475–76 (1994).  Where an act waives the immunity of the United States, in construing the act, a court "should not take it upon [itself] to extend the waiver beyond that which Congress intended." *United States v. Kubrick*, 444 U.S. 111, 117–18 (1979).  Consent to be sued must be "unequivocally expressed," and the terms of such consent define a court's subject matter jurisdiction.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  "[T]he Government's consent to be sued must be construed strictly in favor of the sovereign."  *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992) (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)) (internal quotation marks omitted).

The United States may be liable under the FTCA for certain torts committed by federal employees, both individually and collectively.  *See* 28 U.S.C. § 2671 *et seq.*  The FTCA "recognizes the general principle . . . that the United States should waive its historic defense of sovereign immunity and accept liability for the negligent conduct of government employees who are acting within the scope of their official duties."  14 Wright & Miller, et al., Federal Practice & Procedure § 3658 (3d ed. 1998).  "The FTCA was not intended to create new causes of action; nor was it intended as a means to enforce federal statutory duties.  Instead, Congress's chief intent in drafting the FTCA was simply to provide redress for ordinary torts recognized by state law."  *Howell v. United States*, 932 F.2d 915, 917 (11th Cir. 1991) (internal citations omitted).  Although generally exempted from liability under the FTCA for intentional torts, the United States remains liable for claims arising from certain intentional torts committed by investigative or law enforcement officers, including assault, battery, false imprisonment, false arrest, abuse of process, and malicious

43

prosecution.  28 U.S.C. § 2680(h).  The FTCA requires courts to apply the substantive law of the place where the event occurred.  28 U.S.C. § 1346(b)(1).

Under the law of Michigan, individual defendants sued for assault, battery, false imprisonment, false arrest, or other similar intentional torts allegedly committed while an employee of the government would have the benefit of a limited state law immunity.  Under Michigan law, a governmental employee is immune from liability from intentional torts if he can establish that (1) the challenged actions were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the acts were undertaken in good faith, or were not undertaken with malice; and (3) the acts were discretionary, as opposed to ministerial.  *Odom v. Wayne Cnty.*, 482 Mich. 459, 480, 760 N.W.2d 217, 228–29 (2008); *Ross v. Consumers Power Co.*, 363, 420 Mich. 567, 633–34, 363 N.W.2d 641, 667–68 (1984).  So if the individual employees of the United States were required to defend these state law tort claims on their own, they would benefit from state law immunity.  When the United States is substituted under the FTCA as the only proper party defendant on such claims, does the United States retain the benefit of the same state law immunities available to the employees?

From a policy perspective, the answer would seem self-evident: if the point of the FTCA is to make the United State vicariously liable for certain intentional torts of its employees under state law, there would be no reason to suggest the United States should be subject to broader liability than its employees would face under state law.  Rather, one would expect the liability of the United States to be coterminous with the liability of its employees under state law.  So if an employee would prevail on a particular immunity under state law, so too should the United States under the FTCA.

Several courts have so held. *Norton v. United States*, 581 F.3d 390 (4th Cir. 1978); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1034–35 (N.D. Ill. 2003).

But not all courts have reached this conclusion. *See, e.g.*, *Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009); *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994). These courts agree that law enforcement officers step into the shoes of a private individual under state law with the same authority that attaches to the office holder exercising her duty, including, for example, the authority to use reasonable force in effecting an arrest. *See id.* "To hold otherwise would lead to the absurd result that all federal arrests would subject the Government to tort liability under the FTCA absent a finding that the Government's actions conformed with the state's specific law regarding 'private person' arrests." *Villafranca*, 587 F.3d at 264. But they stop short of giving the United States the benefit of any potential immunities attached to that officer under state law. *Castro*, 34 F.3d at 110–11; *Villafranca*, 587 F.3d at 263–64. The Sixth Circuit has not ruled.

The difference of opinion arises from the language of the statute. The FTCA waives sovereign immunity for tort claims against the United States for injury to person or property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The United States shall be liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The statutory reference to "private individual" and "private person" have led courts like *Villafranca* and *Castro* to conclude that Congress must not have intended to give the United States the benefit of state law immunities available only to public employees. The Court disagrees with

45

these cases and concludes that the language, properly construed, simply precludes the United States from relying on defenses that would be available only to the public employer itself as an entity.

Congress's use of the term "private," as interpreted by the Supreme Court, "is intended to preclude comparison to a public entity (i.e. governmental liability)." *Hanson v. United States*, 712 F. Supp. 2d 321, 326 (D.N.J. 2010) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955) ("[T]he Government in effect reads the statute as imposing liability in the same manner as if it were a municipal corporation and not as if it were a private person, and it would thus push courts into the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations.); *see also Anderson*, 284 F. Supp. 2d at 1034–35 (interpreting the term "private individual" and applying state-law immunity to the United States). As even *Villafranca* and *Castra* recognize, the language of the FTCA necessarily requires the Court to give the United States the benefit of any authority the employee would have under state law—for example, the authority of a police officer to exercise the force reasonably necessary to effect a lawful arrest. The language of the statute does not require a different result when the question is whether to credit the United States with state law immunity that would protect the employee.

That intent is fully honored by precluding the United States from relying on entity-based governmental immunity, but permitting the United States to benefit from the same individual immunities its employees would receive if defending the case on their own. This reading measures the liability of the United States by the liability that would apply to its individual employee if that employee were sued in state court on the state tort law.[5] If the individual employee receives the

_____

[5]Early in the case, the Court denied without prejudice the United States's motion for summary judgment (Docket #13). The Court based its decision, in part, on the theory that the United States was not entitled under the FTCA to the benefit of state-law governmental immunity. (*See*

benefit of special privileges, defenses, and immunities arising out of the employee's authority, so too should the United States receive the benefit of those privileges, defenses, and immunities. To read it otherwise would lead to the incongruous result of the United States opening itself to liability that would never be imposed on the individual employee as an individual defendant under state law. That opens the United States to risk beyond the vicarious liability the United States voluntarily undertook in waiving its sovereign immunity, and would expose the United States to liability that its employee would never have had. Other courts, including one in this district, have similarly applied state-law immunity to FTCA claims. *See, e.g.*, *Moher v. United States*, 875 F. Supp. 2d 739, 761–63 (W.D. Mich. 2012); *Jackson v. United States*, 77 F. Supp. 2d 709, 715 (D. Md. 1999); *Van Schaick v. United States*, 586 F. Supp. 1023, 1034 (D.S.C. 1983). The result is also consistent with the language of the FTCA when construed with the traditional principle that courts strictly construe the government's waiver of sovereign immunity in the government's favor.

A.    *False Arrest or False Imprisonment*

Plaintiffs each allege FTCA claims for false arrest or false imprisonment. "A false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 18, 672 N.W.2d 351, 362 (2003). False imprisonment, by contrast, is "an unlawful restraint on a person's liberty or freedom of movement." *Id.* In other words, a false imprisonment "is broader than, but includes, a false arrest

---

Summ. J. Tr., 12/11/2012, Docket #52, Page ID 726–29; Order, Docket #43, Page ID 524–25.) The broader basis for denial, however, was that there were potential facts that needed to be explored in discovery so the Court could assess potential liability on a complete record. (*See* Summ. J. Tr., 12/11/2012, Docket #52, Page ID 731–33.) At oral argument on the second round of summary judgment motions following plenary discovery, the Court raised the issue of state-law governmental immunity. The parties elected to stand on their briefing rather than submit additional briefs. With the benefit of further reflection and a complete factual record, the Court revisits the issue.

involving law enforcement." *Moore v. City of Detroit*, 252 Mich. App. 384, 387, 652 N.W.2d 688, 690 (2002). The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, (3) the person confined is conscious of his confinement, and (4) the imprisonment was false—without right or authority to confine. *Id.* at 387–88, 652 N.W.2d at 691. To prevail on a false arrest claim, a plaintiff must show that an arrest was not based on probable cause. *Peterson*, 259 Mich. App. at 18, 672 N.W.2d at 362.

Plaintiffs allege that their detentions or arrests were false. The Court looks to the alleged conduct of Agent Reynolds in detaining, and handcuffing or ordering the handcuffing of Plaintiffs. The United States is entitled to the same Michigan governmental immunity from intentional torts that Agent Reynolds would have had under state law. Taking the facts in a light most favorable to Plaintiffs, no reasonable jury could conclude that Agent Reynolds acted in bad faith—i.e., detained or arrested Plaintiffs with malice. *See Odom v. Wayne Cnty.*, 482 Mich. at 480, 760 N.W.2d at 228–29; *Ross*, 363, 420 Mich. at 633–34, 363 N.W.2d at 667–68. Regarding Plaintiff Luis Valdez, Agent Reynolds responded to a threat to officer safety by temporarily handcuffing him. None of Plaintiff's allegations, taken as true, support a jury finding that Agent Reynold's handcuffing was undertaken in bad faith. Quite the opposite, Agent Reynolds elected not to use handcuffs until Plaintiff Luis Valdez pulled away from him and toward Agent Demarse. Nor could a reasonable jury conclude that Agent Reynolds's reasonable but mistaken identification of Plaintiff Telma Valdez was made in bad faith or with malice. Accordingly, the United States is entitled to summary judgment on these claims.

B.    *Assault and Battery*

Plaintiffs allege that the following conduct is actionable: (1) Agent Reynolds's brandishing of a firearm and use of handcuffs on Plaintiff Luis Valdez, (2) Officer Rocha's removal of Plaintiff Telma Valdez's handcuffs and pushing of Plaintiff Telma Valdez, and (3) Agent Demarse's hitting of Plaintiff Telma Valdez's head against her car.  The parties agree that Plaintiff Telma Valdez's FTCA based on the actions of Agent Demarse survives summary judgment.  The Court therefore considers only the conduct of Agent Reynolds and Officer Rocha in determining the United States's potential liability.  Viewing the facts in Plaintiffs' favor, the United States is entitled to summary judgment on Plaintiff Luis Valdez's FTCA claim based on Agent Reynolds's actions.  It is not, however, entitled to summary judgment for Plaintiff Telma Valdez's claim based on Officer Rocha's actions.  Consequently, Plaintiff Telma Valdez's FTCA claim based on the actions of Agent Demarse and Officer Rocha will proceed to trial.

"To recover civil damages for assault, [a] plaintiff must show an intentional, unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVorous v. Burmeister*, 262 Mich. App. 467, 482–83, 687 N.W.2d 132, 142 (2004) (internal quotation marks omitted).  "To recover for battery, a plaintiff must demonstrate a willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* (internal quotation marks omitted).

In Michigan, law enforcement officers may use such force as is reasonably necessary to perform their official duties, such as making an arrest. *Id.* at 481 (citing *Brewer v. Perrin*, 132 Mich.

49

App. 520, 528, 349 N.W.2d 198 (1984)).  "The force reasonably necessary to make an arrest is 'the measure of necessary force [] that [] an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'"  *Id.* (quoting *Brewer*, 132 Mich. at 528, 349 N.W.2d at 202).  "[T]he standard is an objective one under the circumstances."  *Id.*

In this case, Plaintiffs allege that Agent Reynolds committed assault and battery in brandishing his firearm and applying handcuffs to Plaintiff Luis Valdez.  Because no reasonable jury could find that Agent Reynolds acted in bad faith or with malice in brandishing his firearm or applying handcuffs to Plaintiff Luis Valdez, summary judgment is appropriate.

By contrast, the United States may be liable for assault and battery for Officer Rocha's alleged offensive touching of Plaintiff Telma Valdez in removing her handcuffs and pushing her down the stairs. For the reasons set forth above with respect to Plaintiff Telma Valdez's excessive force claim against Officer Rocha, a reasonable jury could find that Officer Rocha did not act in good faith.  The Court will deny the United States summary judgment on this claim.

C.      *Intentional Infliction of Emotional Distress*

Finally, Plaintiffs allege FTCA claims for intentional infliction of emotional distress.  The parties agree that Plaintiff Telma Valdez's claim survives summary judgment.  The Court therefore considers only Plaintiff Luis Valdez's claim.  "As is often noted, [the Michigan Supreme Court] has not officially recognized the tort of intentional infliction of emotional distress."  *VanVorous*, 262 Mich. App. at 481, 687 N.W.2d at 141.  "Assuming that the cause is valid, recovering for the tort requires a plaintiff to prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress."  *Id.* at 481, 687 N.W.2d at 141–42

(internal quotation marks omitted).  Whether the offending conduct is extreme and outrageous is initially a question of law for the court.  *Id.* at 481, 687 N.W.2d at 142 (citing *Sawabini v. Desenberg*, 143 Mich. App. 373, 383, 372 N.W.2d 559, 565 (1985)).

The threshold for showing extreme and outrageous conduct is high.  The Michigan Supreme Court has observed:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602–03, 374 N.W.2d 905, 908–09 (1985) (quoting the Restatement (Second) of Torts § 46, cmt. d).  In this case, Plaintiff Luis Valdez has failed to show that Defendants' conduct was extreme and outrageous, even considering the facts in the best light for Plaintiffs.  "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  The rough edges of our society are still in need of a filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."  *Id.* (quoting the Restatement (Second) of Torts § 46, cmt. d).

The offending conduct at issue in this case is the officers' alleged comments about Plaintiff Luis Valdez's presumed illegal status.  Given the high threshold for establishing "extreme and outrageous" conduct, no reasonably jury could find that the officers' alleged comments, while

unprofessional, constituted extreme and outrageous conduct.  The United States is entitled to summary judgment on this claim.

## B. Plaintiffs' Motion

Plaintiffs seek summary judgment on the following claims: (1) Plaintiffs' Fourth Amendment unlawful arrest claims against Agent Reynolds, (2) Plaintiffs' FTCA claims for false arrest or false imprisonment, and (3) Plaintiff Luis Valdez's FTCA assault and battery claim.

### 1.   Fourth Amendment Unlawful Arrest

Viewing the facts in Agent Reynolds's favor, Plaintiffs are not entitled to summary judgment on their Fourth Amendment unlawful arrest claims.  The situation on the ground at 43 Rose Street was unpredictable.  Cars unexpectedly arrived at the premises.  Plaintiffs' car made an abnormally loud noise, as if the driver had been speeding and then "slammed" on the brakes.  When Agent Reynolds approached Plaintiff Luis Valdez's side of the car, Plaintiff Luis Valdez exited the vehicle and behaved in a way that made it difficult to ask for or obtain his identification.  Agent Reynolds had to get the situation under control.  Agent Reynolds could see that Plaintiff Telma Valdez looked like one of three women, two of whom were known alien fugitives.  Moreover, accepting the Defendants' version of events for purposes of assessing Plaintiffs' summary judgment motion, Plaintiff Telma Valdez was uncooperative, resistant, and "ranting and raving," and Plaintiff Luis Valdez was agitated and threatening.  Viewed in such a light, fact questions would remain for a jury on whether Agent Reynolds's detention of Plaintiffs was reasonable.  Plaintiffs are not entitled to summary judgment.  To the contrary, as the Court has previously concluded in this opinion, Agent Reynolds is entitled to qualified immunity on the unlawful arrest claim.

**2.      Federal Tort Claims Act**

Viewed in Defendants' favor, fact questions would remain on Plaintiffs' FTCA claims for false imprisonment or false arrest and assault and battery.  Indeed, the Court has already concluded that the United States is entitled to summary judgment on these claims, except for the assault and battery claims based on the alleged conduct of Agents Rocha and Demarse against Plaintiff Telma Valdez.  As to these claims, the facts in the light most favorable to Defendants—who deny they mistreated Plaintiff Telma Valdez—could lead a jury to return a verdict for the United States.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is **denied in part and granted in part**.  It is granted with respect to (1) Plaintiffs' Fourth Amendment unlawful arrest claims, (2) Plaintiff Luis Valdez's Fourth Amendment excessive force claim against Agent Reynolds, (3) Plaintiffs' Fifth Amendment claims, (4) Plaintiffs' FTCA claims for false arrest or false imprisonment, (5) Plaintiff Luis Valdez's claim for assault and battery, and (6) Plaintiff Luis Valdez's FTCA claim for intentional infliction of emotional distress.  Defendants' motion is denied with respect to (1) Plaintiff Telma Valdez's Fourth Amendment excessive force claim against Officer Rocha, and (2) Plaintiff Telma Valdez's FTCA claim for assault and battery against the United States respecting Officer Rocha's conduct.  Trial will be scheduled on these claims, as well as the claims of Plaintiff Telma Valdez that the parties agree survive summary judgment (namely, excessive force against Agent Demarse and FTCA claims for assault and battery and intentional infliction of emotional distress).

Plaintiffs' motion for summary judgment (docket #129) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' unopposed motion to substitute exhibits (Docket #145) is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' stipulation and proposed order (Docket #147) is **DISMISSED AS MOOT**.  (*See* Docket ##181, 182.)

As a result of this Order, Plaintiff Luis Valdez has no claims remaining, and Defendants Putra, Reynolds, and Lutton have no claims left against them personally, so the parties are terminated from the case.


Dated:      November 7, 2014          /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      UNITED STATES DISTRICT JUDGE